UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH MALVASIO, and<br>GREGG MARCUS,<br>  a/k/a "Gregg Pierce,"<br><br>Defendants. | SEALED INDICTMENT<br><br>23 Cr.<br><br>**23 CRIM 396** |

### COUNT ONE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury charges:

Overview

1. From at least in or about March 2017 through at least in or about August 2023, JOSEPH MALVASIO and GREGG MARCUS, a/k/a "Gregg Pierce," the defendants, operated an advance fee scheme that defrauded hundreds of victims of at least approximately $12 million. MALVASIO and MARCUS operated this fraudulent scheme through their ownership and operation of business called Global Capital Partners Fund LLC ("Global Capital Partners Fund" or "GCPF"). MALVASIO and MARCUS falsely represented that GCPF was a legitimate business that would provide loans to individuals who were interested funding for private commercial projects. Instead, MALVASIO and MARCUS defrauded victims, collecting thousands of dollars in fees from each victim without intending to issue a loan.

MALVASIO and MARCUS's Fraud Scheme

2. JOSEPH MALVASIO and GREGG MARCUS, a/k/a "Gregg Pierce," the defendants, took advantage of victims who might not have been able to obtain funding through

traditional banks. MALVASIO and MARCUS made some effort to appear as if they were running a legitimate lending operation when they collected fees from victims, including by typically requiring a loan application, collecting some documents from the victims, and setting some contractual terms to the purported loan. As soon as they received all fees they sought, they informed the victim that he or she was in breach of the terms of the parties' agreement, and thus would not receive a loan. MALVASIO and MARCUS also drafted their agreements with victims such that all fees paid were nonrefundable in the event that a purported issue with the loans materialized. MALVASIO and MARCUS have generally structured the scheme as follows:

  a. MARCUS began each relationship with a victim by having a phone conversation in which he explained what kind of loan GCPF could offer. Those phone conversations were typically arranged by a particular employee of GCPF ("CC-1"). When purporting to be a representative of GCPF, MARCUS identified himself to victims using an alias, namely, "Gregg Pierce." MARCUS never gave his real name when interacting with victims.

  b. In initial phone correspondence with victims, MARCUS typically told the victims that GCPF was flexible, would be able to issue any kind of loan the victim was looking for, and that GCPF would be able to "work something out" if there were any issues that might provide an impediment to a loan. MARCUS also often verbally represented to victims that fees paid were refundable in the event that GCPF did not issue a loan.

  c. After an initial screening call with MARCUS in which the victim explained the kind of loan he or she was seeking, MALVASIO or MARCUS prepared a "letter of intent" for the victim, which stated the terms of the purported loan and included a fee that had to be sent by wire transfer immediately in order for MALVASIO and MARCUS to review the loan application. The fee generally depended on the size of the purported loan and ranged from as low as a few

thousand dollars to as high as tens of thousands of dollars. MALVASIO and MARCUS structured their scheme such that the letter of intent fee became nonrefundable as soon as GCPF next sent what it deemed a "commitment letter" to the victim, which typically followed within a few days, even though MALVASIO and MARCUS had not undertaken any real work to evaluate the victim's loan application. MARCUS told each victim to transfer the "letter of intent" fee into one of five bank accounts controlled by MALVASIO and MARCUS. MARCUS managed fee intake for the scheme, and typically informed MALVASIO either via email or text as soon as they received a wire transfer from a victim.

       d.     After the victim paid the required "letter of intent" fee, MARCUS would confirm receipt and let the victim know that their file was in "underwriting." At this stage, the victim typically began to correspond mainly with MALVASIO. MALVASIO then sent the victim a "commitment letter," and informed each victim that they were required to pay a separate "commitment fee," as stated in the letter, before MALVASIO and MARCUS would purportedly agree to issue a loan. MALVASIO and MARCUS typically required a "commitment fee" in the amount of 1% of the total loan amount sought, although the amount fluctuated throughout the duration of the scheme. Many victims expressed shock that they were required to pay another fee before being offered a loan, but MALVASIO and MARCUS simply referred them to the general terms of their "letter of intent." At this stage, MALVASIO or MARCUS often pressured the victims to quickly send the "commitment fee" by claiming that their loan applications could only be considered for a short period of time.

       e.     After the victim paid the "commitment fee," MALVASIO typically informed each victim via emailed letter that the victim next needed to pay an additional "appraisal fee" before they could receive a loan. Receiving an appraisal on a subject property is a typical

process for receiving a loan, but MALVASIO and MARCUS generally charged three to four times more than the industry standard for the appraisal. Many victims expressed surprise when told that they were required to pay far above-market value for an additional appraisal when they had already obtained an appraisal in the course of pursuing a loan. The victims would then typically contact MARCUS, with whom they first interacted, to inquire as to why MALVASIO was requiring an additional "appraisal" fee. Despite forwarding all correspondence from victims directly to MALVASIO and communicating daily with MALVASIO about each victim, MARCUS typically informed each victim that he "no longer had their file" and that the victim would have to speak with MALVASIO to resolve any issues. At other times, MARCUS falsely told victims that their "file" was with "operations" and that he could no longer help them. Generally, throughout the scheme, MARCUS would refer victims to MALVASIO every time the victim voiced an issue or problem in order to create the illusion of separation between MALVASIO and MARCUS. In reality, the two were corresponding regularly about each victim, including when they received money from each victim.

        f.      Despite protest from victims about the exorbitant cost of the appraisal or the fact that the property had already been appraised by a licensed appraiser, MALVASIO would remind the victim that the victim had agreed to an appraisal as a condition of the loan, and that only MALVASIO was permitted to choose the appraiser under the terms of the "commitment letter." As part of the scheme, MALVASIO would then order an appraisal on the subject property. MALVASIO used a handful of preferred appraisers and would typically pay them far less than what he charged the victims. For example: in January 2019, MALVASIO and MARCUS charged a victim $13,750 for an appraisal that ultimately cost only $4,000. In another instance, MALVASIO and MARCUS charged over $18,000 for an appraisal that cost them only $5,000.

g. The majority of victims were defrauded through MALVASIO and MARCUS's manipulation of the appraisal process. Typically, MALVASIO informed the appraiser that the subject property was to be valued at its lowest possible value. MALVASIO did this in order to ensure that the appraisal, while appearing legitimate, would value the property too low to justify issuing the promised loan. For example, in one April 2018 email exchange, MALVASIO instructed the appraiser to "deeply discount [the property] because of the time it would take to sell in a default." In many other emails, he noted that he needed only the "as is" value of the property, and that he was not interested in "value for anything that may or may not happen in the future." Similarly, he often told appraisers that he was only interested in the "90 day liquidation value" of a property. MALVASIO and MARCUS ordered low appraisals despite knowing that, under the victim's understanding, the loans were predicated on the amount of value the victim intended to add to the property—typically, by building some sort of commercial development project. In order to conceal the nature of the scheme, MALVASIO instructed the appraiser that he or she was not to speak with the victims under any circumstances, and that all communication regarding the subject property was to be through MALVASIO.

h. As a result of his instructions, MALVASIO typically received appraisal reports that valued the subject properties at far lower than the stated value in the loan application documents submitted to GCPF by the victims. Because MALVASIO and MARCUS would initially agree to fund only a certain percentage ratio of the property's value (the "loan to value ratio"), receiving a low appraisal in effect rendered the property outside the specific loan to value ratio specified in the parties' agreement. MALVASIO and MARCUS then used the loan to value ratio as an excuse not to fund the loan. Specifically, after reviewing each appraisal report, MALVASIO contacted each victim to inform them that the subject property had appraised for

5

lower than the assumed value when GCPF agreed to issue a loan; that GCPF would therefore not be able to issue a loan; and that all fees paid would not be refunded.

        i.      At this stage of the scheme, many of the victims typically asked to see a copy of the appraisal to understand the often very large discrepancy in value the victim's appraiser found versus the value MALVASIO's appraiser found. During these email exchanges, MALVASIO typically grew combative and told the victims that the appraisal he obtained—at the victim's expense—was his property only; he would not share it with the victims; and the victims were contractually forbidden from contacting the appraiser in order to get a copy of the appraisal for themselves. MALVASIO also instructed each appraiser throughout the duration of the scheme that they were not permitted to speak directly with the victims, and that any questions about the subject property had to be funneled through him.

        j.      On rare occasions, MALVASIO shared a copy of the appraisal with victims. In those instances, the victims quickly pointed out issues with the valuation method used in the appraisal, including, typically, that MALVASIO had ordered the appraiser to calculate the property's lowest possible value, despite the fact that the parties understood the loan to be predicated on the value the victim intended to add to the property through the use of the loan proceeds. In at least some instances, it was apparent that the appraiser never even visited the property. Despite the victims' having identified issues with the appraisals, MALVASIO continually refused to refund any of the money paid and continued to assert that the victim had violated the terms of the loan agreement. In addition to their manipulation of the appraisal process, MALVASIO and MARCUS also manufactured other excuses not to issue a loan, sometimes relating to other purported legal or logistical impediments with a subject property that MALVASIO identified to the victim.

3. Many of the victims came to understand later on in their interactions with GCPF that JOSEPH MALVASIO and GREGG MARCUS, a/k/a "Gregg Pierce," the defendants, never intended to issue them a loan. In the beginning, MARCUS was typically accommodating and responsive to victims' questions and concerns. But once fees were paid and the "file" had been "passed" to MALVASIO, MALVASIO and MARCUS generally became far less responsive. When a victim was able to get in contact with MALVASIO, he would reiterate that all fees paid were nonrefundable. If a victim attempted to get his or her money back or threatened to contact the authorities, MALVASIO continually refused to issue a refund and was generally antagonistic in his interactions with the victims.

4. As the scheme went on, JOSEPH MALVASIO and GREGG MARCUS, a/k/a "Gregg Pierce," the defendants, began to accumulate a number of negative online reviews from victims. In an effort to cover up their fraud, MALVASIO and MARCUS hired a company to assist them with posting several dozen fake Google reviews in which fake individuals claimed to have successfully obtained loans from GCPF. In other instances, MALVASIO and MARCUS retaliated against their victims through legal action in an attempt to discourage them from publicly disclosing their experiences with GCPF.

5. Throughout the duration of the scheme, JOSEPH MALVASIO and GREGG MARCUS, a/k/a "Gregg Pierce," the defendants, received victim money in at least five different bank accounts. Each of those five bank accounts was opened by MARCUS at various points throughout the scheme. Typically, MALVASIO and MARCUS would use one bank account until it had accrued so many fraud claims that MALVASIO and MARCUS began to worry about the bank freezing or closing the account. At that point, MARCUS would open another bank account and would begin directing victims to the new bank account. The fraudulent scheme generated

more than $12 million in fraud proceeds for MALVASIO and MARCUS, virtually all of which was then transferred to the personal bank accounts of MALVASIO and MARCUS.

6. Once JOSEPH MALVASIO and GREGG MARCUS, a/k/a "Gregg Pierce," the defendants, transferred the victim funds to their personal accounts, they used the money to make payments in the tens of thousands of dollars to Porsche, BMW, and Modern Yachts LLC, among other dealers of luxury goods. MALVASIO and MARCUS also used victim funds to make payments in the hundreds of thousands of dollars to American Express for personal credit card expenses.

Statutory Allegations

7. From at least in or about March 2017 through at least in or about August 2023, in the Southern District of New York and elsewhere, JOSEPH MALVASIO and GREGG MARCUS, a/k/a "Gregg Pierce," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

8. It was a part and an object of the conspiracy that JOSEPH MALVASIO and GREGG MARCUS, a/k/a "Gregg Pierce," the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, MALVASIO and MARCUS agreed to and did operate an advance fee scheme through which they defrauded victims of at least approximately $12 million,

and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

9. The allegations contained in paragraphs 1 through 6 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

10. From at least in or about March 2017 through at least in or about August 2023, in the Southern District of New York and elsewhere, JOSEPH MALVASIO and GREGG MARCUS, a/k/a "Gregg Pierce," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, MALVASIO and MARCUS operated an advance fee scheme through which they defrauded victims of at least approximately $12 million, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION

11. As a result of committing the offenses alleged in Counts One and Two of the Indictment, JOSEPH MALVASIO and GREGG MARCUS, a/k/a "Gregg Pierce," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense, including but not limited to any and all money in the following bank accounts:

    a. All monies and assets on deposit on account number 6099389220 at Wells Fargo Bank held in the name of Global Capital Partners Fund LLC.

    b. All monies and assets on deposit on account number 3660470604 at Wells Fargo Bank held in the name of Global Capital Partners Fund LLC.

    c. All monies and assets on deposit on account number 5927478874 at Wells Fargo Bank held in the name of Global Capital Partners Fund LLC.

    d. All monies and assets on deposit on account number 5927119593 at Wells Fargo Bank held in the name of Global Capital Partners Fund LLC.

    e. All monies and assets on deposit on account number 8166630031 at Wells Fargo Bank held in the name of Gregg Marcus.

    f. All monies and assets on deposit on account number 6481293048 at Wells Fargo Bank held in the name of Gregg Marcus.

    g. All monies and assets on deposit on account number 2488641149 at Wells Fargo Bank held in the name of Hawksnest Properties LLC.

  h. All monies and assets on deposit on account number 1503880047 at Flagstar (formerly Signature) Bank held in the name of Gregg Marcus.

  i. All monies and assets on deposit on account number 1503880055 at Flagstar (formerly Signature) Bank held in the name of Gregg Marcus.

  j. All monies and assets on deposit on account number 1503879995 at Flagstar (formerly Signature) Bank held in the name of Global Capital Partners Fund.

  k. All monies and assets on deposit on account number 1501052228 at Flagstar (formerly Signature) Bank held in the name of Gregg and Randi Marcus.

  l. All monies and assets on deposit on account number 9980490914 at Citibank held in the name of JAM, Inc.

  m. All monies and assets on deposit on account number 9960107498 at Citibank held in the name of Joseph Malvasio.

  n. All monies and assets on deposit on account number 6869831350 at Citibank held in the name of Joseph Malvasio.

## **Substitute Assets Provision**

 12. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third person;

  c. has been placed beyond the jurisdiction of the Court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

> (Title 18, United States Code, Section 981;
> Title 21, United States Code, Section 853; and
> Title 28, United States Code, Section 2461.)

_____ (DFP)
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney